UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 21 CR 272 |
| v. | |
| RICARDO MUNOZ | Hon. John F. Kness |

## GOVERNMENT'S SENTENCING MEMORANDUM

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits its sentencing memorandum. To account for the seriousness of former City of Chicago Alderman Ricardo Munoz's ("defendant") conduct and for the other reasons set forth below, the government recommends that the Court sentence defendant within the advisory guidelines range to a term of imprisonment of one year and one day. Such a sentence is sufficient, but not greater than necessary, to satisfy the principles set forth in the Sentencing Guidelines and 18 U.S.C. § 3553(a).

## BACKGROUND

Defendant was elected to the City Council for the City of Chicago six times, serving as alderman of the 22nd Ward on the southwest side of Chicago from 1993 to 2019. Defendant also served as a member of the Progressive Reform Coalition of the Chicago City Council, which was a coalition of approximately 10 self-proclaimed reform-minded aldermen and commonly known as the Chicago Progressive Reform Caucus ("CPRC"). According to its bylaws, the purpose of the CPRC was to "creat[e] a more just and equal Chicago, combatting all forms of discrimination and advancing

public policies that offer genuine opportunities to all Chicagoans." The voting membership of the CPRC was limited to members of the Chicago City Council.

The CPRC also formed a political action committee under Illinois law and registered it with the Illinois State Board of Elections ("BOE"). The CPRC was funded by contributions from labor unions, corporations, political committees, and private individuals. The CPRC had paid contractors, including Individual A, Individual B, and Individual D, whose roles also included assisting with accounting for CPRC finances. Additionally, defendant had an aldermanic assistant on his staff, Individual C, who also assisted with accounting for CPRC finances.

Defendant served as the chair of the CPRC from December 2013 through January 2019, and during this same time period, he also performed the duties of treasurer of the CPRC and controlled the CPRC's bank account ("CPRC account"). Defendant was only authorized to expend CPRC funds to promote the mission and purposes of the CPRC.

Defendant also had his own campaign committee, Citizens for Munoz ("CFM"), that was registered with the BOE and whose purpose was to assist defendant's re-election efforts. Defendant controlled CFM's bank account ("the CFM account"). Individual C and Individual D assisted with accounting for CFM's finances.

Because it was formed under Illinois law, the CPRC's political action committee was subject to the Illinois Election Code, 10 Ill. Comp. Stat. § 5/9 *et seq*. Illinois law restricted how political action committees could expend funds to prevent elected officials—like defendant—from using funds improperly for their own personal

2

benefit. Namely, under Illinois law, political action committees—including the CPRC—could not make an expenditure "[f]or payments to a public official . . . or his or her family member unless for compensation for services actually rendered by that person;" "for an individual's tuition or other educational expenses, except for governmental or political purposes directly related to a candidate or public official's duties and responsibilities;" or "for the travel expenses of any person unless the travel is necessary for fulfillment of political, governmental, or public policy duties, activities, or purposes." 10 Ill. Comp. Stat. § 5/9-8.10(a)(6), (10), (11).

To promote transparency, Illinois law required political action committees—including the CPRC—to disclose all expenditures exceeding $150, as well as the purpose of the expenditure, on quarterly statements called Form D-2s that were required to be filed with the BOE and made available for public inspection. 10 Ill. Comp. Stat. § 5/9-11(4), (12).[1]

Defendant flouted the CPRC's bylaws and Illinois law. Defendant misappropriated approximately $37,891.99 belonging to the CPRC between 2016 and 2019. Defendant used the money to pay personal expenses for himself, family members, and friends. These expenses included college tuition for a family member; jewelry; cufflinks; a loan payment on one of his personal vehicles; women's clothing; three Apple iPhones and accessories; aerial sightseeing trips; sports tickets; skydiving excursions; and other entertainment expenses. Defendant also lied to the staff of the CPRC to cover up his embezzlement of CPRC funds.

---

[1] CFM was also subject to these same provisions of the Illinois Election Code.

## The Advisory Guidelines Range

The government has no objections to the Presentence Investigation Report's ("PSR") calculation of the advisory guidelines range.  Defendant pled guilty to counts one and three of the indictment, which charged defendant with committing wire fraud (in violation of 18 U.S.C. § 1343) and engaging in monetary transactions with property derived from specified unlawful activity (in violation of 18 U.S.C. § 1957). The PSR correctly calculated defendant's guidelines range to be 10 to 16 months' imprisonment based on an adjusted offense level of 12 combined with criminal history category I as detailed below:

Offense Level

### Count 1 – Wire Fraud

| | |
|---|---|
| Base Offense Level (§2B1.1(a)(1)) | 7 |
| Increase Based on Loss Between $15,000 and $40,000 (§2B1.1(b)(1)(C)) | 4 |
| Abuse of Private Trust (§3B1.3) | 2 |
| Total | 13 |

### Count 3 – Engaging in Monetary Transactions with Property Derived from Specified Unlawful Activity

| | |
|---|---|
| Base Offense Level (§2S1.1(a)(1)) | 13 |
| Money Laundering Conviction (§2S1.1(b)(2)(A)) | 1 |
| Total | 14 |

### Grouping of Counts 1 and 3

| | |
|---|---|
| Adjusted Offense Level | 14 |
| Acceptance of Responsibility (§3E1.1(a)) | -2 |

4

Total                                                                    12

    <u>Criminal History Category</u>                                        I

**Advisory Guidelines Range**     **10 to 16 months' imprisonment**

<u>**The Factors Set Forth in 18 U.S.C. § 3553(a)**</u>

Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[2] In order to determine the sentence to impose, the Court must consider the statutory factors listed in § 3553(a)(1)-(7). One of those factors is the advisory range set by the Sentencing Guidelines, and another is the Sentencing Commission's policy statements. Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). For the reasons set forth below, consideration of the § 3553(a) factors reflect that a sentence within the advisory guidelines range of 10 to 16 months' imprisonment is warranted and necessary. A non-custodial or below-guidelines sentence would send the wrong message: that a politician can act with impunity by embezzling from a political action committee that he was entrusted to manage, and then lie about it. This conduct needs to be met with a serious repercussion—which in the government's view is a sentence of one year and one day imprisonment.

---

[2] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

<u>The Nature and Circumstances of the Offense</u>

Defendant was a six-time elected alderman making an annual salary of over $115,000 by the end of his tenure.  But defendant apparently felt that he needed more money—and he began embezzling from the CPRC to get it.  In so doing, defendant abused his public position and betrayed the public trust. The labor unions, corporations, political committees, and private individuals who contributed money to the CPRC did so believing that defendant and the other aldermen who comprised the CPRC would use their elected offices to further the CPRC's stated goal of "creat[ing] a more just and equal Chicago."  Defendant violated the trust of the contributors to the CPRC, his constituents, the general public, and the voting members and staff of the CPRC by diverting approximately $37,891.99 of funds from the CPRC's bank account for his own personal benefit.  In doing so, defendant also violated the oath he took as an alderman where he swore to faithfully discharge the duties of his office to the best of his abilities.

Defendant began misappropriating money from the CPRC in 2016 and continued until early 2019.  Defendant took affirmative steps to keep his crime a secret from the contributors to the CPRC, the voting members of the CPRC, the contractors and staff of the CPRC, and the public.  He lied to the staff and contractors of the CPRC, causing them to prepare and file Form D-2s with the BOE that contained false statements and omitted material information required to be disclosed. The net effect of the false Form D-2s was to keep the contributors to the CPRC, the

voting members and staff of the CPRC, and the public in the dark, so that defendant could go on embezzling funds.

### October 31, 2016 $16,000 Withdrawal from the CPRC

On October 31, 2016, defendant caused $16,000 to be electronically transferred from the CPRC account to a joint personal account he controlled ("joint personal account"), intending to use the funds to pay an overdue tuition expense for a family member. This $16,000 transfer was the largest single withdrawal of funds from the CPRC account in the history of the CPRC. At the time of this transfer, defendant's joint personal account had a balance of approximately $293.95. That same day, defendant caused a transfer of approximately $15,254 from his joint personal account to an out-of-state university to pay an overdue tuition expense for the family member.

On December 5, 2016, defendant transferred $16,000 from his personal account to the CPRC account to repay that amount after having received a Parent Plus loan for the tuition payment.[3] Even though defendant ultimately repaid those funds, the CPRC was deprived of the use of those funds for over a month. During that time, the CPRC was exposed to the financial risk that defendant would be unable to secure a loan to repay the money that he had embezzled from the CPRC account.

### October 2018 & December 2018 Electronic Transfers of CPRC Funds to Defendant's Personal Accounts

In October 2018, defendant caused approximately $7,100 to be electronically transferred from the CPRC account to his personal account, intending to use the

---

[3] As detailed in the PSR, defendant receives a credit against loss for this amount because he repaid that amount before the CPRC uncovered that he had been stealing money from it.

funds for his own personal benefit. And, in December 2018, defendant transferred another $500 from the CPRC account to the CFM account to buy Chicago Bulls tickets for himself.

### a. October 12, 2018 $5,000 Quickpay Transfer

In particular, on October 10, 2018, defendant caused a "Quickpay[4]" transfer of $5,000 from the CPRC account to his personal account. At the time of the transfer, defendant's personal account only had $3.98. Shortly before causing this transfer, defendant created a new email account through Google and linked that new email address to his personal account.

In an attempt to conceal the $5,000 Quickpay transfer, defendant indicated that the transfer went to someone with a name almost identical to Individual A save for an additional consonant in the surname and the number 2 added to the end. Defendant did so to make it appear as though the money went to Individual A—not himself. Defendant linked this dummy name to the new email account that he created right beforehand.[5] As a result of this false entry into the Quickpay system, the monthly bank statement issued by Chase for the CPRC account listed the name of a fictitious person who closely resembled in spelling the name of Individual A—not defendant—as the recipient of the $5,000 transfer, when, in fact, defendant was the

---

[4] Quickpay is a feature offered by Chase Bank that allows individuals who have Chase accounts to transfer money. Quickpay has an online feature, which allows Chase account holders to access their accounts and send Quickpay money transfers online themselves. The Quickpay feature allows the user to enter the name of a person receiving funds when initiating the transfer. The name of the recipient is then reflected in the Quickpay transfer on the bank account statement.

[5] Individual A had received legitimate Quickpay transfers from the CPRC in connection with Individual A's duties as a paid contractor. Thus, it would not be abnormal for there to be a Quickpay from the CPRC account to Individual A.

recipient of the money. A cursory glance of a bank statement would not reveal the fraud, which is what defendant intended in creating the dummy recipient.

Further, the chart below details how defendant spent the $5,000 that he received with the $5,000 Quickpay. Between October 10, 2018 and October 25, 2018, there was only one additional transfer of $300 into defendant's personal account. During that time period, defendant used the misappropriated $5,000 to pay for, among other things, jewelry and cufflinks from Louis Vuitton, an insurance payment on a personal luxury vehicle, women's clothing from a Nordstrom's store, and an aerial sightseeing trip.



b.  <u>October 26, 2018 and October 29, 2018 Electronic Transfers</u>

On October 26, 2018, defendant caused approximately $2,300 to be transferred from the CPRC account to the CFM account, and then from the CFM account to his personal account.  At the time of the $2,300 transfer, defendant's personal account had a balance of $58.76. Between October 26, 2018 and October 29, 2018, defendant used funds from his personal account on an aerial sightseeing trip and two Apple iPhones and related accessories.

Also, on October 29, 2018, defendant caused approximately $2,100 to be transferred from the CPRC account to his personal account.  At the time of the $2,100 transfer, defendant's personal account had a negative balance of $882.54.  During the week following this $2,100 transfer, defendant used funds from the personal account to buy another Apple iPhone and related accessories and a skydiving excursion.

The items that defendant purchased with the funds that he embezzled on October 26, 2018 and October 29, 2018 are detailed below.

10

CHICAGO REFORM CAUCUS PAC - ■

| POSTED DATE | DESCRIPTION | DEBIT | CREDIT |
|---|---|---|---|
| 10/25/18 | *DAILY ENDING BALANCE* | | 28,138.37 |
| 10/26/18 | 10/26 Online Transfer to Chk ■ | (2,300.00) | |
| 10/26/18 | *DAILY ENDING BALANCE* | | 25,838.37 |
| 10/29/18 | 10/28 Online Transfer to Chk ■ | (2,100.00) | |

CITIZENS FOR MUNOZ - ■

| POSTED DATE | DESCRIPTION | DEBIT | CREDIT |
|---|---|---|---|
| 10/25/18 | *DAILY ENDING BALANCE* | | 348.21 |
| 10/26/18 | Online Transfer from Chk ■ | | 2,300.00 |
| 10/26/18 | 10/26 Online Transfer to Chk ■ | (2,500.00) | |

RICARDO MUNOZ - ■

| POSTED DATE | DESCRIPTION | DEBIT | CREDIT |
|---|---|---|---|
| 10/25/18 | *DAILY ENDING BALANCE* | | 58.76 |
| 10/26/18 | Online Transfer from Chk ■ | | 2,500.00 |
| 10/29/18 | Card ■ Purchase - Aviation Professionals Chicago IL | (373.55) | |
| 10/29/18 | ATM Withdrawal | (500.00) | |
| 10/29/18 | Card ■ Purchase - The Home Depot Cicero IL | (96.66) | |
| 10/29/18 | Card ■ Purchase - Verizon Wireless Chicago IL | (1,080.42) | |
| 10/29/18 | Card ■ Purchase - Verizon Wireless Chicago IL | (1,190.67) | |
| 10/29/18 | Online Transfer from Chk ■ | | 2,100.00 |
| 10/30/18 | Card ■ Purchase - Blueberry Hill La Grange IL | (31.93) | |
| 10/30/18 | Online Transfer from Chk ■ | | 450.00 |
| 10/31/18 | Card ■ Purchase - Smoke Trail BBQ LLC Paris IL | (40.77) | |
| 11/01/18 | Card ■ Purchase - One Stop Citgo Paris IL | (44.04) | |
| 11/01/18 | Card ■ Purchase - City of Chicago Service Fees | (7.88) | |
| 11/01/18 | Card ■ Purchase - City of Chicago Ticket | (400.00) | |
| 11/01/18 | Card ■ Purchase - Illinois Tollway | (11.90) | |
| 11/01/18 | Card ■ Purchase - Aldi Chicago IL | (181.61) | |
| 11/01/18 | Card ■ Purchase - The Home Depot Chicago IL | (157.10) | |
| 11/01/18 | Online Transfer from Chk ■ | | 300.00 |
| 11/02/18 | Card ■ Purchase - Skydive Chicago IL | (100.00) | |
| 11/02/18 | Card ■ Purchase - Hubbard State Cigar Shop Chicago IL | (128.00) | |
| 11/02/18 | Card ■ Purchase - Apple Store Deer Park IL | (925.28) | |
| 11/02/18 | Card ■ Purchase - Shell Service Station Chicago IL | (3.95) | |
| 11/02/18 | Online Transfer from Chk ■ | | 300.00 |
| 11/02/18 | *DAILY ENDING BALANCE* | | 237.09 |

c. Underline December 2018 Electronic Transfers

On December 10, 2018, defendant caused $500 to be transferred from the CPRC account to the CFM account. At the time of this transfer, the CFM account had a balance of approximately $8.08. There were no additional transfers to the CFM account from any source between December 10, 2018 and December 12, 2018. Two days later, on December 12, 2018, defendant caused $400 to be transferred from the CFM account to an acquaintance as reimbursement for four tickets to a Chicago Bulls

game that defendant enjoyed in his personal capacity; it had nothing to do with the CPRC.

### *November & December 2018 Cash Withdrawals of CPRC Funds*

In November and December 2018, defendant made cash withdrawals totaling $10,560 from the CPRC account. These cash withdrawals included a $1,960 cash withdrawal in Chicago hours before defendant flew to New York for a vacation over the Thanksgiving holiday in November 2018, and three cash withdrawals totaling $4,000 that defendant made in New York during that vacation. Below is a summary of the cash withdrawals:

| Transaction Date | Type of Withdrawal | Location |
|---|---|---|
| November 3, 2018 | $4,000 Counter Withdrawal | Chicago, Illinois |
| November 21, 2018 | $1,960 Counter Withdrawal | Chicago, Illinois |
| November 23, 2018 | $2,000 Counter Withdrawal | Bronx, New York |
| November 24, 2018 | $1,000 ATM Withdrawal | Bronx, New York |
| November 25, 2018 | $1,000 ATM Withdrawal | Bronx, New York |
| December 7, 2018 | $600 ATM Withdrawal | Chicago, Illinois |

*Debit Card Purchases Using CPRC Funds*

Defendant also made purchases for his own personal benefit and the benefit of an acquaintance using a debit card linked to the CPRC's account. Namely, while vacationing in Los Angeles in early November 2018, defendant used the CPRC debit card to make the following purchases: $544.98 for a Southwest Airlines ticket on November 8, 2018 for an acquaintance to fly back from Los Angeles, California to Chicago, Illinois; $169.32 for Los Angeles Kings hockey tickets on November 9, 2018; and $291.44 for a hotel stay at a Los Angeles Crowne Plaza incurred on November 9, 2018. Additionally, while on vacation in Pittsburgh, Pennsylvania on December 9, 2018, defendant used the CPRC debit card to pay for a $265.77 dinner with the acquaintance at an Eddie V's Prime Seafood restaurant in Pittsburgh, Pennsylvania. Lastly, on February 12, 2019, defendant used the CPRC debit card to pay for $160.48 worth of items purchased at a Lover's Lane store in West Dundee, Illinois.

*False CPRC Fourth Quarter 2016 Form D-2 Filing*

Defendant also lied to Individual C and Individual D about the nature of certain expenditures, knowing that Individual D would then falsely report them on the CPRC's Form D-2s with the BOE. In particular, on January 17, 2017, after reviewing CPRC bank statements, Individual D via email asked Individual C about the transfer of $16,000 from the CPRC account on October 31, 2016. Individual C forwarded this email to defendant, who replied to Individual C that the $16,000 did not need to be reported because that money had been paid back into the account during the same quarterly reporting period. Individual C forwarded that email to

13

Individual D, who—adhering to defendant's directive—did not report the $16,000 expenditure on the CPRC Form D-2 even though the expenditure far exceeded the $150 threshold which triggered the D-2 reporting requirement.

A copy of the email is copied below. Defendant's purported excuse about why the $16,000 expenditure did not need to be reported on the CPRC Form D-2 was false, and because of defendant's directives to Individual C and Individual D, this expenditure was concealed from the BOE, the members and staff of the CPRC, and the public.



#### *False CPRC Fourth Quarter 2018 Form D-2 Filing*

On January 15, 2019, Individual D, after reviewing the CPRC bank statements covering the last quarter of 2018, asked Individual C via email about certain banking

transactions, including the $2,100 transfer out of the CPRC account on October 29, 2018 and the cash withdrawals from the CPRC account during November and December 2018. Individual C forwarded Individual D's email to defendant later in the day. On the same day, defendant responded via email to Individual C that the expenditures discussed in the email added up to $12,200, which was incorrect—the total amount was $13,160. Defendant went on to state in the email that all the funds had already been deposited back in the CPRC account and that, therefore, the expenditure of the funds did not need to be reported on a D-2. Defendant's statement was false. In truth, *no* deposits were made into the CPRC account between November 15, 2018 and March 4, 2019.

Individual C forwarded defendant's false response to Individual D, who, again adhering to defendant's directive, did not report those expenditures identified on the CPRC's Form D-2 for the fourth quarter of 2018. When defendant sent the false email response on January 15, 2019, the monthly statement for the CPRC account covering January 2019 had not yet been generated, so Individual C and Individual D had to rely on defendant's false say-so. As a result, all of those expenditures were concealed from the BOE, the members and staff of the CPRC, and the public.

Defendant also caused affirmative false statements to be made on the CPRC Form D-2 for the fourth quarter of 2018. Namely, as discussed above, as a result of defendant's false entry of Individual A's name into the Quickpay system, the CPRC monthly statement listed a variation of Individual A's name that defendant created— not defendant—as the recipient of the $5,000 transfer on October 10, 2018. Relying

15

on this monthly statement, Individual D also listed the $5,000 expenditure on the Form D-2 as a legitimate consulting expense paid to Individual A—which was false.



### *False Statements to CPRC Contractors*

In 2019, defendant also attempted to conceal his conversion of CPRC funds from agents of the CPRC. Between January 2019 and March 2019, Individual A and Individual B asked defendant to give them online access to the CPRC account so that they could review the account balance. But, defendant refused to do so. On March 7, 2019, Individual B requested information about the CPRC account balance, which information was needed for a CPRC meeting scheduled for that evening. In response, defendant falsely told Individual B in an Apple iMessage that the CPRC account had approximately $11,000 in funds, when the CPRC account in actuality had approximately $94.79 at that time.

### *Repayments*

On March 19, 2019, defendant made a $10,000 transfer to the CPRC. And, on August 23, 2019, defendant made a $5,000 transfer to the CPRC. At the time of both these transfers, contractors at the CPRC had already learned that defendant had

stolen money from the CPRC.[6]  Even though defendant repaid some money, the CPRC had to expend resources in conducting an investigation into defendant's embezzlement. Further, on June 11, 2020, defendant received an Apple iMessage from Individual A asking whether he would pay the remaining amount that he owed to the CPRC.  In response, defendant stated, "Working on it."  Defendant still owes approximately $6,891.99 to the CPRC—which as discussed below, is the restitution amount in the plea agreement.

*Improper Withdrawals and Transfers from the CFM Account*

In addition to the flagrant nature of the offense conduct as outlined above, there is other evidence in aggravation in this case.

Between January 2018 and March 2018, defendant made four separate cash withdrawals totaling approximately $8,700 from the CFM account. In response to an inquiry from Individual D (who was preparing CFM's Form D-2 filing for that quarter), defendant told Individual C via email that this money went to a printer for "signs," as reflected in the email exchange below:

---

[6] As a result, defendant does not receive a credit against loss for guidelines purposes for this repayment.  He does, however, receive a restitution credit.



As a result, the quarterly CFM Form D-2 reported that that this money was spent with a printer for that purpose. In truth, this cash did not go to the printer. The owner of that printing company advised that, while his company performed work for defendant, those "projects were never paid in cash" and that the highest grossing project he performed for defendant totaled "$3,500." The owner produced records to the government, which showed that the owner billed CFM on January 2, 2018 for

18

$2,185, which CFM paid by check, and billed defendant another $334 on March 27, 2018. The printing company's files contained no records of any purported work performed during this time period relating to defendant. Bank records do not reflect the $8,700 that defendant withdrew from the CFM account being deposited back into that account. Although the government's investigation did not determine what defendant did with that money, one thing is clear: defendant did not use the money to pay the printing expense as he told Individual D and as reflected on the CFM Form D-2 for the first quarter of 2018.

Additionally, on August 1, 2018, there was a debit card purchase using CFM's account at a Men's Warehouse clothing store in the amount of $2,634.81. In email correspondence, defendant instructed Individual C that the $2,634.81 expense at Men's Warehouse was for "office uniforms." There is no evidence suggesting that anyone affiliated with CFM wore or had any use for office uniforms—or that office uniforms were a legitimate expenditure for CFM to have made.

As a result of defendant falsely telling Individual C and Individual D that this expense was for "office uniforms," Individual D filed a CFM Form D-2 for the third quarter of 2018 indicating that this expense was for "office uniforms." The government's investigation revealed that this money went to purchase suits for another individual running for office, that defendant sought repayment for these suits, and that in so doing defendant told the individual who received the suits that "the suits should stay off ur books so just pay it out to me." That individual ultimately transferred $3,000 from a campaign account to defendant's personal account via a

19

check dated November 11, 2018. Defendant deposited this check into his personal account on November 19, 2018—only two days before he flew to New York on November 21, 2018 to begin his vacation over the Thanksgiving holiday. At the time of this $3,000 deposit, defendant's personal account had a balance of approximately $492.72. Defendant then used funds from his personal account to purchase an airline ticket to New York that cost approximately $600.96. The bank records do not reflect the $3,000 being transferred back into the CFM account.

The above evidence is consistent with the conclusion that defendant used his own campaign fund—CFM—to cover his own personal expenses, which fits the pattern of the offense conduct to which defendant has pleaded guilty.

<u>History and Characteristics of Defendant</u>

Defendant is 55 years old. He grew up in a supportive family with hard-working parents and siblings, one of whom described him as a pillar of support. PSR at ¶ 47. Defendant has also struggled with substance abuse issues and was going through a divorce during part of the charged conduct (and which is still ongoing). *Id.* at ¶¶ 51, 64. These factors are mitigating, and can be considered by the Court in fashioning a sentence. But, they do not excuse it. Indeed, the conduct at issue was not a momentary lapse of judgment—it was a years-long fraud scheme. A guidelines sentence would account for the seriousness of defendant's conduct, which showed a person living beyond his means and using CPRC cash to support a lifestyle that others do not enjoy.

20

<u>The Need to Promote Respect for the Law,</u>
<u>Provide Just Punishment, and Afford Adequate Deterrence</u>

A guidelines sentence would promote respect for the law, provide just punishment, and afford adequate deterrence. *First*, a non-custodial sentence here will send the wrong message to the public: that public officials who violate the law are held to a different—more lenient—standard than others. In fact, public officials should be held to a higher standard. Defendant was only able to commit these crimes because of his role as an elected official; everyday citizens do not have access to political action committee funds that they can dip into when they are short on cash. A custodial sentence here would promote respect for the law by showing that no one—not even elected officials—are above the law.

Moreover, the victim of the offense—the CPRC—has had its reputation damaged as a result of defendant's actions. City Council members formed the CPRC with the idea of promoting good government, and with that mantra, solicited donations from citizens to help with their efforts. Defendant misappropriated over $37,000 of that money. When elected officials embezzle money from organizations like the CPRC, it denigrates the public's confidence in these groups. It also ingrains a sense of cynicism within the public mindset that there is no point in donating to political causes because the money will not be used for its intended purposes.

*Second*, intertwined with promoting respect for the rule of law—and equally important—is the concept of general deterrence. Chicago has a long and sad history of seeing its elected officials going to prison for violating their public oaths to serve the citizenry's interests ahead of their own. Sadly, Chicago is as well-known for its

corruption as its points of pride that make the city a truly special place. The problem has become so bad that it is not out of the ordinary to hear that a long-time elected official—such as defendant—is facing federal charges due to misconduct while in office. This needs to stop. Politicians here need to know that breaking the law has consequences. And, this case can send an important message in the campaign finance field, which as this case shows, is ripe for politicians using campaign funds for improper purposes.

Courts across the country have commented on the deterrent effect of a custodial sentence in these types of cases as well. Put simply, those in similar positions as defendant take notice of custodial sentences in these types of cases. *See, e.g.*, *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (stating that "white-collar criminals . . . are . . . prime candidates for general deterrence"); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("[C]onsiderations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (internal quotation marks omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (stating the importance of "the deterrence of white-collar crime (of central concern to Congress), the minimization of discrepancies between white-and blue-

collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail.").

*Finally*, specific deterrence also weighs in favor of a guidelines sentence. Defendant is no longer an elected official. And, as a result of the felony convictions in this case, he is unlikely to hold elected office again. He thus lacks the means to commit the same type of misconduct in the future. Nonetheless, a guidelines sentence still can serve an important message to defendant that actions have consequences, and that a lifetime of good deeds do not excuse criminal conduct.

## Supervised Release

Consistent with the Seventh Circuit's guidance in *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015), the government recommends the imposition of a term of supervised release of three years. In order to promote the sentencing objectives of deterring recidivism, protecting the public, and assisting in defendant's rehabilitation and reintegration into society, the government supports the Probation Department's recommendation of conditions as detailed in the PSR, although the government's position is that these conditions should be part of a term of supervised release—not a probationary sentence.

## CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court impose a sentence of imprisonment of one year and one day, which is within the advisory guidelines range of 10 to 16 months' imprisonment. Such a sentence is well supported under the § 3553(a) factors: it will reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, properly account for defendant's history and characteristics, and provide a fair and uniform sentence.

Dated: December 22, 2021       Respectfully submitted,

                             JOHN R. LAUSCH, JR.
                             United States Attorney

By:    */s/ Morris Pasqual*
        MORRIS PASQUAL
        JARED HASTEN
        Assistant United States Attorneys
        219 S. Dearborn Street, 5th Floor
        Chicago, Illinois 60604
        (312) 353-5300

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that the foregoing was served on December 22, 2021 in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, L.R. 5.5 and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as the ECF filers.

/s/ Morris Pasqual      